of the Army and O. Mr. Musar for the appellate, Mr. Lucas for the appellate. Mr. Lucas for the appellate. Mr. Lucas for the appellate. Mr. Lucas for the appellate. Mr. Lucas for the appellate. Good morning. Good morning, Your Honor. May it please the Court, James H. Lassaro representing Aaron Dibacco and Barbara Webster, who are the substituted plaintiffs for the initial plaintiff, Carl Oglesby. This case presents several important issues, both with respect to exemption claims, particularly exemptions B-1 and B-3, and two exemption three statutes, the CIA Act and the NSA Act. I will turn first to deal with the exemptions. The government is citing as standard law that where an agency submits affidavits in support of a motion for summary judgment, the summary judgment may be granted solely upon the basis of those affidavits. However, there are very important qualifications to that assertion. Particularly, the affidavits must be detailed, and secondly, they must not be conclusory or speculative or simply boilerplate. The government is citing as standard law that where an agency submits affidavits in support of a motion for summary judgment, the summary judgment may be granted solely upon the basis of those affidavits. The government is citing as standard law that where an agency submits affidavits in support of a motion for summary judgment, the summary judgment may be granted solely upon the basis of those affidavits. The government is citing as standard law that where an agency submits affidavits in support of a motion for summary judgment, the summary judgment may be granted solely upon the basis of those affidavits. And we would contend that, first of all, let me say that the question directed at me narrows the scope of what is at issue here because the CIA has relied upon declarations that cover the universe of records that were allegedly released under the National War Crimes Act. And if you look at the supplemental appendix, there is a list of documents that begins, and if you look at the very first of the documents, I'm in the supplemental appendix, and this is the Vaughn index that was submitted. The supplemental joint appendix? Yes. It's a supplemental. There are two supplemental appendixes. It's the supplemental addendum, actually. It's an addendum that was put in when the government filed its brief in this case. They asked for permission, and I did not object, to put all of the government's affidavits in a single volume. And so it is that volume that I'm referring to. And the first page of it has the first entry. What page are you on, Mr. Lazar? Well, it's a little hard to tell because there are overwriting, but it looks like it's page 76 of 90. 74 is the first page. Essay 74. Okay. Anyway, if you look at the beginning of the Vaughn index, the first item says volume one, and then it says it's 13 pages. And it says copies of photo. And then it says that it's undated and that it is under subject. It says photos of mounting sheets containing photos and negatives of Galen. And you go over and it's deleted B3 alone. And it has next to that CIA file markings. Now, the only issues before us now are the 10 redacted documents and another argument as to whether the search was adequate. But I don't understand the relevance of a Vaughn index for documents that are not at issue here. But I may be missing something, so help me. Yeah. Well, these documents were put before the district court, and they are relevant because they bear, among other things, on the credibility of the declarants who have submitted affidavits. They have submitted affidavits declaring that, first of all, they have tried to shift the focus from the nature of Oglesby's original request. He made several requests, not one request. And as I point out in my brief, the government and the district court below misrepresented the nature of the request. The requests are much broader in their scope than this court has previously acknowledged. And I go through that in great detail in my brief. I think the wording of the actual request that was used here. I thought we were here to maybe to discuss the scope of the review. The remand was all about these documents that have been recently produced. And your argument is that there was an inadequate search and that exemptions were misapplied. But I don't think we're here to relitigate the adequacy of searches that we have found in the past were sufficient. As I understand it, you've got to show us that the newly produced documents somehow should have triggered a greater search than was undertaken. And that we can do very simply because the documents that were remanded to us contain markings on them that contain file designations. And the government has filed affidavits saying what they tried to do with them. And basically it boils down to the documents are too old. We don't know what the status of the documents. Exactly. That's what they said. So they have not done a search. They have not done a search which is required. I thought their argument was we can't do a search. We don't know what these markings mean. And the reason they don't know what they mean is they haven't done a proper search. And they don't know because, among other things, if you read through their various declarations, they say that they've determined that the information is properly classified and so forth and so on. And they do not address the issue of whether or not they did a search. The documents themselves contain information indicating that there are additional files. They haven't done the search that is required. And it comes out most dramatically when they have relied upon the 2007 interagency report to Congress, which lists the documents that they reviewed. They claim that there were only minimal redactions because the CIA, in its generosity, interpreted in accordance with the National War Crimes Disclosure Act, interpreted the request to give Oglesby more information than he was entitled to. What they have done is to eliminate the terms of his original request and whether they actually complied with that request. And they did. Among other things, the National War Crimes Disclosure Act is, excuse me, the National War Crimes Disclosure Act specifically states that the CIA, that it did not review the records of the OSI, the Office of Special Investigation, in the Department of Justice, which holds 450,000 pages of records that are part of the Search for War Crimes Records Fund Game. So those haven't been looked at at all. The Archives claims that it did a search, but it didn't do a search. All right, Mr. Lazar, the judge has indicated you've answered his question and you're out of time. We'll give you a couple minutes in reply. Okay.  Thank you. Mr. Lucas. Good morning. Brinson Lucas of the United States. May it please the Court. I'd like to start, Judge Griffith, with your question, and I think you're absolutely correct that all you need to address here with respect to the redactions is the Exemption 3 issue. Exemption 3 covers all of the issues. Well, let's pick up where Mr. Lazar was with the adequacy of the search. How do you respond to his arguments that there are these markings on these documents and the government did not conduct an adequate search to see if there are other documents out there? I would point you to this Court's decision in the last appeal in debacle 2 where it went through and discussed extensively why the Army search for this was entirely adequate and, indeed, went beyond what FOIA required. And so the question on remand with respect to the adequacy of the search was whether anything in the new documents that produced called that into question. And I think the district court, in a very thorough opinion, explained why these top-secret replacement sheets did not call that into question. She found the declaration of Joanne Veneer, who said that she and her staff had no idea where these top-secret documents from the late 1940s were taken or placed years ago, and nobody knows where they are. And the district court reasonably understood and said that, look, given this Court's holding in debacle 2 that the government's search went beyond what FOIA required, if these documents still existed, they certainly would have turned up. So we think that the presence of these top-secret replacement sheets, especially with the credible affidavit of Ms. Veneer, resolves any sort of question that. What if you have a situation where a search is conducted and a responsive document is produced and it's a memorandum and the author of the memorandum says, you know, this is a follow-up to my prior memorandum dated January 1st about this same subject. But the January 1st memorandum hasn't been produced in response. What, if any, obligation does an agency have under those circumstances? Judge Wilkins, I think it might depend on the particular context of the case. I think here, given that there isn't an analogous memorandum or anything along those lines to suggest it, there's no obligation to conduct a further search, because I think it's important to remember that the standard under FOIA is adequacy, not perfection. But you're suggesting that if there were a hypothetical situation like I just posed, if someone from the government said, well, I have no idea how to find that prior memorandum, that we shouldn't probe that, that the district court has no responsibility to call that person in for a hearing, to allow them to be cross-examined, that they should just kind of take at face value a blanket statement that, you know, I have no idea where to look for that memo, case closed. I don't know if I'd go that far, Judge Wilkins, but I think you can look at the specific context of the case. And I think here, especially given that all of the search efforts by the government were extensively documented and reviewed by this court and found adequate, the fact that the government just doesn't know where these documents from the late 1940s is, there shouldn't be any concern in this particular case. There shouldn't be concern, even though documents turned up in the middle of the last appeal? Those documents, some of the reason why those documents turned up in the last appeal is there was a dispute over fee waivers, and they were eventually produced for free to plaintiffs, and that's why they appeared. It was just an ongoing dispute. I mean, this case has been going on for, you know, for three decades at this point, and the fact that it came out after an extensive review by the government and search, I don't think that should give this court any pause or concern about the adequacy of the search efforts here. I've got a question, because I'm confused by the affidavit of Ms. Benear. And what I'm confused about is this specimen, just a specimen page of these replacement sheets that block out whatever is written there. Is the microfilm still intact at the archives? Are the documents that were microfilmed and are blocked out here still in existence? I don't believe so, Honor. I understand that the documents from the late 1940s, they don't know where those original documents were. They belonged to the Army, and what happened was those documents were only, that sort of transfer document was only supposed to contain, you know, no higher-than-secret, so all the top-secret documents were removed sometime during the 1940s. So my understanding is Ms. Benear, and nobody knows exactly where those documents were taken. Do we know whether they exist? That is something that's not in her affidavit, whether they even exist. And do we know, another question, once these documents were microfilmed, what happened to the documents themselves? Are they, I just keep going back to if we wanted to look at what was redacted on this replacement sheet, could we? No, Your Honor. And why not? Because the government just does not know where those documents went. They were taken out and put with top-secret replacement sheets back in the 1940s. And do we know that? Because there's no date for when these things were microfilmed. I assume they were turned over to archives within the last 20 years, but it looks like, I don't know this, that they were microfilmed a long, long time ago. And I don't even know when microfilm was available to the Army, probably before it was available to the rest of us. Your Honor, to the best of my knowledge, I don't think there's anything in the record that would suggest that these documents still exist or are still available. What the Army does know is that these documents were taken out sometime in the close to following World War II and top-secret replacement sheets were inserted in their place. And all that we have at this point are those top-secret replacement sheets. We don't know where those documents went. And we also don't know if a microfilm was made of these top-secrets. Your Honor, my understanding is that if a microfilm existed, it would have turned up in those previous searches. The National Archives has all of the microfilm documents that are available, so if these still existed, they would have turned up. And that's what the district court found and said, look, given how extensive the search efforts were before, surely these documents, if they still existed, would have turned up given the exhaustive nature of the government searches. Well, the top-secret replacement sheets didn't turn up until just recently. Isn't that correct? And that's why we remanded it in the first place. In other words, they found these top-secret replacement sheets. Your Honor, the top-secret replacement sheets and these transcript documents was produced to plaintiffs during the last appeal. But it's not like those documents had just mysteriously been uncovered. There was just ongoing dispute over a particular set of documents, over the fee waivers for that, and they were produced during the last appeal. It wasn't sort of a mystery as to where these documents suddenly came from. I think they actually go back to the declarations of Ms. Murphy back in 2012, where she references these documents. The reason they came up on the last appeal was solely due to a fee waiver dispute. And if I could turn just to the exemption issues, I'd just like to go to your point, Judge Griffith, that Exemption 3 is the main question here. If you find that these documents and these redactions are covered by Exemption 3, that's the end of the case. And I'd specifically like to address the CIA Act, which takes care of 15 out of the 25 redactions. And the CIA Act, very straightforward on its face, covers CIA personnel information. And indeed, Ms. Wilson, in her declaration, explained that the CIA information included names of CIA employees and CIA organizational information. That's confirmed if you take a look on the face of these documents, ranging from pages 25 to 41 of the supplemental appendix. All of them clearly indicate that they're just either names of CIA employees or perhaps titles. And so plaintiffs don't really dispute this, but they do offer two arguments, and we don't think either is persuasive. First, they try and muddy the waters by mixing precedents concerning personnel information with a sort of a new exemption that they want to create, or a new exception to the exemption for personnel documents. And we just don't think there's any support in the Act for that. And secondly, they focus on the language employed by the agency and seek to limit that to only CIA personnel who are currently employed. But that interpretation would be nonsensical on its face. As soon as a CIA employee left the agency, all the protection for that particular individual and his family and where anybody had come in contact would vanish. And I think you can find that on page 71 of the supplemental appendix, which is the last declaration, which discusses the harm from disclosing former CIA employee information. Now, plaintiffs' only response to this is that FOIA exemptions are narrowly construed. But there's no support for the proposition that that interpretative rule should be extended to derivative statutes under Exemption 3. And I'd like to give you an analogy. Under the Tucker Act, the Supreme Court has always said that waivers of sovereign immunity are narrowly construed. I see my time is up. May I have a minute to finish my point? Go ahead. But under the Tucker Act, which says the following statutes and regulations are narrowly construed, the Supreme Court has never said, and it's fact that the principle of narrow constructions of sovereign immunity do not extend to those substantive statutes themselves. So unless the Court has any further questions, I ask you to affirm for the reasons set forth in our brief. I've got one question, just so I'm absolutely certain. The specimen I showed you of the top secret replacement sheet, if you all at the CIA wanted to see what was redacted, can you tell me whether that's possible or not? I believe it's not possible. No, we don't know where those went. Okay. Thank you. All right. Mr. Lazar, you've used your time, but we'll give you two minutes. Yes. Okay. Thank you very much, Your Honor. The – there are a host of problems. We have called attention to a case which the government chiefly relied upon in the Robinson v. Shalloway case in which they used that to argue what he just argued, that the statute doesn't include former employees, that it does include former employees. As I have pointed out extensively in my brief, that argument, first of all, is pre-Milner. Secondly, it is – it involved a Title VII Civil Rights Act case. But it does, in terms of statutory interpretation, have an impact. But the – if you analyze it, as we did in our briefs, the impact goes the opposite direction. It supports the case that you have to more narrowly interpret the statute. Even if you concede that it's ambiguous, you have to make a decision. You analyze the legislative history. And there's a particular case that's appropriate here, which I recently reviewed, Allen v. CIA, 636 Fed 2nd, 1287. And at 1290, and again at 1296 through 1300, the chief judge, Skelly Wright, analyzed the Exemption 1 and Exemption 3 statutes and said that the wording in them was inherently subject to interpretation. That it was not – it required an extra degree of scrutiny to determine the scope of the protection. And that in light of the purpose of the FOIA, to get information out to the public, you have to give priority. This was in response to the Robinson case, Robinson v. Shavoyle case that he's relying upon. Their analysis of that misapplies the statutory criteria. If you look at the FOIA, and if you look at the executive order under which this is handed down, it talks about the unauthorized disclosure of information. And you have to have extra degree of scrutiny, greatly enhanced, where the records are more than 25 years old. And that has not been done here. It wasn't done initially. All of this bears on the credibility of the affidavits which this Court previously relied upon. The previous decision in this case simply accepted the fact that they were old records. I would call your attention to paragraph 20 of the first LUTs, the 2012 LUTs declaration. And to note 11, it says, Under the categories, under these categories was regarding, was released under the National War Crimes Disclosure Act. Exemption, for example, names of. All right, Mr. Hazar, your time is up. Okay. But the point of it is that this contradicts the claim that they made. And the declarations of these clients is they're not credible. They're conclusory. They don't address contradictory evidence that is in the record and evidence of bad faith that is in the record. All of that was put forth in affidavits that we filed, in materials that we filed. The Linda Hunt materials from her book referred to specific files at the National Archives that had not been searched. Okay. We have your brief. We have your argument. Thank you very much. Thank you.
judges: Henderson, Griffith, Wilkins